Herman SIMON and Ursula Simon

v.

**COMMISSIONER OF INTERNAL REVENUE.**

Appeal of Herman SIMON and Ursula Simon.

**CONSOLIDATED LUMBER CORPORATION**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

Appeal of CONSOLIDATED LUMBER CORP.

Jack PEARLSTEIN and Thelma Pearlstein, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE.**

Nos. 86–5911 to 86–5914.

United States Court of Appeals, Third Circuit.

Argued Aug. 19, 1987.
Decided Oct. 7, 1987.

Guy R. Fairstein, (argued), Summit Rovins & Feldesman, New York City, for appellants.

Robert M. Olsen, Asst. Atty. Gen., Michael L. Raup, Anne Belanger Durney, Laura A. Snyder (argued), Attys., Tax Div., Dept. of Justice, Washington, D.C., for appellee.

Before GIBBONS, Chief Judge,
WEIS, Circuit Judge, KELLY, District Judge.*

## OPINION OF THE COURT

GIBBONS, Chief Judge.

These four consolidated appeals are from a final order of the United State Tax Court determining that there was a deficiency in the taxpayers' federal income tax for the taxable year 1976.[1] At issue are claimed deductions for expenses paid or incurred in that year in carrying out a trade or business, or for the production or collection of income. 26 U.S.C. §§ 162(a)(3), 212(1) (1954). The expenses sought to be deducted are $6,000,000 in advance royalties, and $75,000 in management and legal fees, accrued by a limited partnership, Tennessee Coal Associates (TCA), in a coal mining venture. The Commissioner determined that the limited partnership did not enter into the coal mining venture for the predominant purpose of making a profit. The Tax Court made the same determination, and disallowed the deductions. We will affirm.

### I.

It is well established that in order to take a deduction for expenses incurred in carrying out a trade or business the taxpayer must have entered into the venture with the primary and predominant purpose and objective of making a profit. *See Thomas v. Commissioner*, 792 F.2d 1256, 1259 (4th Cir.1986); *Tallal v. Commissioner*, 778 F.2d 275, 276 (5th Cir.1985). "Primary" in this context means "of first importance" or "principally", while "profit" means economic profit independent of tax savings. *Malat v. Riddell*, 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966); *accord, Surloff v. Commissioner*, 81 T.C. 210, 233 (1983); *Seaman v. Commissioner*, 84 T.C. 564, 588 (1985). "While a reasonable expectation of profit is not essential, the profit movive must be bona fide." *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), *aff'd mem. sub nom. Kratsa v. Commissioner*, 734 F.2d 6 (3d Cir.1984), *aff. mem. sub nom., Hook v. Commissioner*, 734 F.2d 5 (3d Cir.1984), *aff'd sub nom., Barnard v. Commissioner*, 731 F.2d 230 (4th

---

* Hon. James McGirr Kelly, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

**1.** Twelve cases were consolidated in the Tax Court. Eight other appeals are pending in the United States Courts of Appeals for the First, Second, and Fourth Circuits. The parties have agreed that all twelve cases will be disposed of in accordance with the decision of this court. In *Simon v. Commissioner of Internal Revenue,* a loss for 1976 reported by Isidore Feldman & Co., in which Herman Simon was a partner, was carried back to 1973. The carryback case turns on the same issues as the other cases.

Cir.1984), *aff'd mem.* 742 F.2d 1441 (2d Cir.1984). *See also Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir.1963); *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983). A deduction claimed under 26 U.S.C. § 212(1) must meet the same requirements applicable to trade or business expenses under section 162, except that the person claiming the deduction need not be in the trade or business. *Fischer v. United States*, 490 F.2d. 218, 222 (7th Cir.1973).

The taxpayers do not dispute the profit objective test as a general principle. They contend, however, that in applying that test the Tax Court erred in two respects. First, they contend that the Tax Court's finding that the limited partnership lacked a primary profit objective is clearly erroneous. Second, they contend that the court erred in applying the test at the limited partnership level rather than focusing on the objectives of the individual taxpayers. Our review with respect to the first issue is limited to determining whether the Tax Court's findings of fact, including inferences drawn from the facts, are clearly erroneous. *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960); *Imbesi v. Commissioner*, 361 F.2d 640, 643 (3d Cir.1966). The second issue is one of law, as to which our review is plenary.

## II.

Whether the partnership has the requisite profit objective is an issue of fact which must be resolved by examining the surrounding facts and circumstances. *Capek v. Commissioner*, 86 T.C. 14, 36 (1986). In making this determination, greater weight should be given to objective facts than to a mere declaration of the taxpayer's intent. *Flowers v. Commissioner*, 80 T.C. 914, 982 (1983). The burden of proving the requisite profit objective rests with the taxpayer. *See Nickerson v. Commissioner*, 700 F.2d 402, 404 (7th Cir.1983); *Golanty v. Commissioner*, 72 T.C. 411, 437 (1979), *aff'd mem.*, 647 F.2d 170 (9th Cir. 1981). The Tax Court determined that the taxpayers did not meet this burden, and that TCA did not engage in mining activi-

ties for profit. (App. at 71). In so finding, the Tax Court relied on the following factors:

(1) the individuals who organized and conducted TCA's activities failed to testify;

(2) the venture was marketed on the basis of expected tax benefits;

(3) the advance royalty payment in the coal lease was grossly disproportionate to any royalties previously paid for the property;

(4) the TCA partnership made an inadequate evaluation of area 5's mining potential; and

(5) the activities of the TCA partnership were conducted in a manner that assured failure.

The evidence of record supporting the Court's findings discloses that the TCA limited partnership was formed by Fannie Jacobs as general partner and her son Robert Jacobs as the limited partner to deal in and own interests in coal producing properties and leases. In the spring of 1976, Robert began efforts to recruit new investors into the partnership by discussing the possibility of investing in a coal mining venture with Peter Feldman, a partner in the accounting firm of Isidore Feldman and Company. According to Robert, coal was increasingly attractive as an investment due to the 1973 oil embargo and the upward trend in coal prices in 1976. Peter then spoke about the investment to his partners in the accounting firm, Herman Simon and his father Isidore Feldman. The investment discussions did not proceed any further at this time.

In June of 1976, Robert again approached Peter about investing in the coal venture. Numerous discussions followed between Robert and Peter, and between Peter, Isidore and Herman Simon. In the summer of 1976, Peter agreed to join TCA. Isidore then began soliciting investments from potential investors, some of whom were his clients for whom he did tax work.

Isidore succeeded in attracting seven investors, four individuals and three corporations. By letters dated September 23, 1976 and October 7, 1976, the four individuals—

Nathan Henin, Leonard Harris, Jerome Harris, and Jack Perlstein—each agreed to contribute $150,000 for an interest in TCA. The three corporations—Marilyn Togs, Inc., Consolidated Lumber Corp., and National Industries of Lexington, Inc.— adopted resolutions dated September 7, 1976, September 9, 1976, and September 28, 1976, respectively, authorizing an investment of $250,000 in TCA or in a coal partnership in which Peter was a general partner. Three of these seven investors testified at trial that they agreed to invest in TCA, without conducting any independent investigation of the venture, because of Isidore's representations that the profit potential of the investment would be "twofold." First, Isidore advised them that the coal itself would be profitable. Second, Isidore informed them that the investment would be a "tax shelter." Even if "worse came to the worse and they [the investors] wasn't [sic] able to make any money mining the coal ... [Isidore] said there was some tax advantages in making an investment ..." The seven investors did not make any cash outlays, however, until December of 1976. On December 31, 1976, TCA paid Isidore Feldman and Company $300,000 for finding these seven investors.

In the fall of 1976, Robert Jacobs advised Peter Feldman that he could arrange a coal sublease for TCA. While seeking coal properties in Kentucky, Robert Jacobs' partner in an accounting practice, Irving Kanarek, had met John Wolcott, the president of Southeast Coal, Oil & Gas Co., Inc. (Southeast), which held a mineral lease on a parcel of approximately 6,000 acres called the Lacy Tract. Robert Jacobs advised Peter Feldman that K & J, a partnership formed by Irving Kanarek and Robert's brother Alan Jacobs, proposed to sublease the Lacy Tract coal rights. Robert offered Peter (i.e., TCA) a sublease to a 900 acre portion of the Lacy Tract known as area 5. Initially, Robert told Peter that TCA would have to pay $7,000,000 to $7,500,000 in advance royalties for this property. After negotiation, Peter managed to talk him down to $6,000,000. In negotiating this price on behalf of TCA, Peter relied exclusively on Robert's representations regard-

ing the investment's viability, made no attempt to ascertain the prevailing market rates for advance royalty payments, and did not inquire as to the source of Robert's expertise even though Peter had no prior experience in coal mining.

By lease agreement dated October 27, 1987, K & J subleased the Lacy Tract from Southeast. Even though subdivision of the Lacy Tract reduced its mining potential, K & J subdivided this property into six different lots, called area 1 through area 6, and subleased them to at least six different investor groups, one of which was TCA. Five of these lease agreements, including TCA's, were also dated October 27, 1976 and were signed for the lessee partnership by Fannie Jacobs as general partner. As part of the initial lease agreement between Southeast and K & J, Raybled Mining Company (Raybled) was organized by Alan Jacobs, Irving Kanarek and John Wolcott to serve as the contract miner for the entire Lacy Tract. Raybled was funded by K & J.

Southeast, as original lessee, leased the Lacy Tract from its original owners on October 28, 1971 for a 15 year minimum period. John Wolcott signed the lease as president of Southeast. Under the terms of the 1971 lease, Southeast was to pay royalties of $.25 per short ton of coal removed, shipped or sold from underground mining and $.35 per short ton for all coal removed, shipped or sold from strip mining. Southeast also agreed to pay a minimum advance royalty of $60,000 per year, even if no mining was done on the property. The lease gave Southeast the option to purchase the property for $565,000 at any time after October 20, 1972.

Southeast entered into a coal sublease of the Lacy Tract with K & J by agreement dated October 27, 1976 for a 10 year minimum period. Under the terms of the sublease, K & J agreed to pay the royalties due under the original lease, as well as $.10 per short ton of coal removed, shipped, or sold. K & J also was to pay an advance royalty of $1,500,000 prior to December 31, 1976. The advance royalty was to be paid with $750,000 in cash and a $750,000 nonre-

course promissory note. The advance royalty was to be recouped at a rate of $.10 per short ton of coal removed, shipped or sold.

TCA subleased from K & J a 900 acre subdivision of the Lacy Tract known as area 5. The coal sublease provided that TCA as lessee would have the exclusive right to "mine and remove the coal on and in connection with the Premises" subject to enumerated limitations. The sublease was to run for the longer of 10 years or the exhaustion of the merchantable or mineable coal. TCA agreed to pay K & J a royalty of $3.00 per short ton of coal removed, shipped or sold; 25 percent of the sales price above $20.00 per short ton of steam coal or $28.00 per short ton of metallurgical coal removed, shipped or sold; advance royalties of $6,000,000 due prior to December 31, 1976; and a minimum annual royalty of $1,000. Payment of the $6,000,-000 advance royalties were to be paid with $1,000,000 in cash and a $5,000,000 nonrecourse, promissory note. The advance royalty was to be recouped at a rate of $2.50 per short ton of coal removed, shipped, or sold and was not payable until a satisfactory current title report was obtained. There was no provision in the sublease for abatement of any portion of the advance royalty on forfeiture of the sublease by TCA.

Although Peter and the limited partners agreed in the fall of 1976 to contribute to TCA, they did not become formally associated with TCA until December, 1976. Amendments to TCA's Certificate of Limited Partnership were executed on December 28, 1976 and December 30, 1976 substituting Peter for Fannie Jacobs as general partner and providing for the admission of additional limited partners.

In December of 1976, an undated private placement memorandum describing TCA and the proposed coal venture was prepared but not filed with the New York State Attorney General's Office. Although this prospectus was the only information about TCA distributed to the investors in 1976, the memorandum contained no profit projections concerning TCA's activities, it did not disclose the terms of the coal sublease, and did not contain a map showing the location of area 5 of the Lacy Tract. However, the memorandum did contain the following statement about the anticipated tax advantages to the investors:

Generally, no Federal income tax will be payable by the Partnership, but each Limited Partner will be required to report on his Federal income tax return his proportionate share of all items of income, gain, loss, deduction or credit of the Partnership for each taxable year during the life of the Partnership, regardless of whether any actual distribution of cash has been made to such Limited Partner during such year. It is anticipated that, by reason of the payment of a very substantial Advance Royalty, part in cash and part by a Note, the Partnership will have a very substantial deduction in its first year (Treasury Regulations Section 1.612–3(b)).

In addition, the memorandum also contained caveats:

*Although the attractiveness of this investment is, to a considerable extent, based upon anticipated benefits currently available under the present provisions of the Internal Revenue Code of 1954, as amended, and the regulations promulgated thereunder, there is no assurance that such laws and regulations will not be changed, and there is no assurance that the anticipated tax benefits will be available to the Limited Partners....*

Recently, the Service has proposed a revision of its applicable regulation (Treasury Regulation Section 1.612–3(b)) with the effect of imposing severe restrictions on the deductibility for Federal income tax purposes of advance royalty payments similar to the Advance Royalty which the Partnership contemplates paying. Based upon the facts recited to it and the documents which it has reviewed, *counsel to the Partnership is of the opinion that the transaction which is the subject of the Memorandum is not affected by this proposal;* however, there can be no assurance that the Service will not disagree with this conclusion

or question the deductibility of the Advance Royalty on any other grounds. (emphasis added).

Attached to this memorandum was a 25 page opinion of a tax lawyer on the federal income tax aspects of an investment in TCA. The opinion contained the following regarding the deductibility of the advance royalties:

It must be noted that the IRS issued IRS Information Release 1687 on October 29, 1976, and published a Proposed Amendment to Treasury Regulations Section 1.612.–3(b) on November 2, 1976. The announcement, which also includes the proposed new language states:

"Under the proposed amendment, the treatment of advance royalties would be revised effective October 29, 1976, unless the advance royalties are required to be paid pursuant to a mineral lease which (i) was binding prior to that date upon the party who in fact pays or accrues such royalties, or (ii) was required, pursuant to a written contract to be executed by the party who in fact pays or accrues such royalties, provided that such party established, to the satisfaction of the Secretary or his delegate, that under all the facts and circumstances the contract was binding upon such party prior to that date.

For purposes of clause (ii) above, the contract in no event will be considered to be binding upon such party if the obligations imposed on such party prior to October 29, 1976, were not substantial or were illusory."

You have informed me that on October 27, 1976, the Partnership entered into a binding sub-lease with K & J the sub-lessor of the coal property which requires the Partnership to pay the Advance Royalty.

You have further informed me that this is a firm commitment of the Partnership, subject only to cancellation if the Partnership does not receive a favorable title report concerning the subject coal properties on or before December 31, 1976.

Based solely on the foregoing, and without the benefit of court decisions or Revenue Rulings interpreting the proposed regulation, I am of the opinion that the Partnership has entered into a binding mineral lease, prior to October 29, 1976, which includes the obligation to pay the Advance Royalty.

Regulations referred to in this opinion letter were finally adopted in December of 1977, retroactive to October 29, 1976. The K & J–TCA sublease was dated October 27, 1976.

Each taxpayer, except Peter Feldman, signed a subscription agreement warranting, *inter alia:*

(1) that he had read the private placement memorandum;

(2) that he had consulted with his tax advisor regarding the tax consequences of his participation in the partnership; and

(3) that "he has a net worth (exclusive of home, furnishings and automobile) of at least $300,000 and expects that, after taking into account his share of the anticipated losses incurred by the partnership, at least some portion of his current gross income will be subject to Federal income tax of at least 50%."

The actual funding of TCA occurred in late December of 1976, when TCA received $1,500,000 in contributions. On December 29, 1976 and December 31, 1976, checks totalling $1,100,000 and dated between December 14, 1976 and December 31, 1976 were delivered to TCA. Of this amount, $912,500 was by check payable from Isidore representing amounts he received from investors made payable to him as attorney-in-fact. In addition, Marilyn Togs, Inc. and Grady White Boats, Inc., a subsidiary of National Industries of Lexington, Inc., each delivered notes in the amount of $200,000 collateralized by an irrevocable letter of credit on December 31, 1976.

On December 31, 1976, TCA delivered to K & J the following in lieu of the $6,000,-000 advance royalties called for by the lease: (1) a check for $925,000; (2) the two corporate notes totalling $400,000; and (3) a nonrecourse note payable by TCA in the

amount of $4,675,000. The $4,675,000 notes provided for interest on the outstanding balance to begin accruing on June 1, 1977 at six percent per annum. Interest and principal were to be paid in equal monthly installments of $51,902.08 beginning on June 30, 1977. The principal amount was to be prepaid to the extent that TCA mined and sold more than 17,301 tons of coal in any month. The note was secured by a security interest in and general lien upon the Leasehold Property and the proceeds derived from the use and exploitation thereof. Under the terms of the security agreement, the "Secured party ... shall have no rights or remedies against the lessee or its general and limited partners." After paying K & J and the management and legal fees, TCA retained cash in the total amount of $101,000. TCA had no other assets except a receivable in the amount of $100.

In order for TCA to meet its note payments to K & J, it would have had to produce approximately 240,000 saleable tons of coal per year from area 5. However, over the 10 year period preceding TCA's lease, only 997,874 tons of coal had been mined in the entire three-county area in which area 5 is located. The Lacy Tract itself had not been mined between 1930 and 1970. After 1971, a contract miner hired by Southeast had abandoned its efforts to mine the property after strip mining only 10,000 tons of coal. Subsequently, Southeast was unable to locate another contract miner before subleasing the property to K & J. Despite this negative history, TCA agreed to pay K & J almost $6,000,000 in advance royalties without having made an independent investigation of the property prior to the execution of the K & J—TCA sublease, without employing a geologist, mining engineer or consultant to evaluate the coal reserves of area 5, without investigating the prior ownership of the mineral rights on the property, without sending anyone to visit the property, and without inquiring as to Southeast's previous experience in mining coal. In entering the lease on TCA's behalf, Peter Feldman relied solely upon Robert Jacobs' representations as to the coal reserves on the property. Consequently, the sublease did not even contain an opt-out clause should Robert's representations prove incorrect, even though six-month opt-out clauses are customary.

After the October 27, 1976 execution of the K & J–TCA sublease, Peter prepared his own profit projection analysis for TCA on December 2, 1976. These projections were based on information from Robert Jacobs and from a report dated November 9, 1976 prepared by John G. Donan, Jr. of Donan Engineering, Inc. for Southeast (Donan Report). The underlying assumptions of the Donan Report expressly included the following:

2. I assume no responsibility for matters legal in nature nor do I render any opinion as to the title or the lease which is assumed to permit the recovery of the coal.

3. It was not within the scope of this study to evaluate the mining plans to recover the coal seams and it was assumed that the coal can be mined by present mining methods and practices.

4. The plats, legal descriptions, map, drill hole data, seam thickness, outcrop elevations, and other reports furnished to me were assumed to be correct.

The Donan Report did not contain any cost estimates for the mining of the coal. It was well known in 1976 that underground coal mining in the three-county region in which area 5 is located was fraught with problems due to erratic, sporadic deposits of coal in the various coal seams. In 1976, coal seams that were thinner in width than 28 inches could not be economically mined because, under the mining practices then in existence, it was impossible to mine these seams without also mining large amounts of rock that had to be cleaned from the coal. Old maps of the mining operations on the Lacy Tract revealed that previous miners had mined only the thick parts of the seams and left the thin parts behind. The coal that remained in the Lacy Tract was a dirty, ashy coal that required cleaning or washing to be readily marketable.

The only washing facility in the immediate vicinity was approximately 10 miles away.

On November 10, 1976, Southeast had requested Donan to subdivide the Lacy Tract into six parcels. Donan was instructed to make the parcels rectangular in such a manner that the coal reserves on each parcel would be equal. Donan completed the subdivision on November 15, 1976. However, this subdivision substantially reduced whatever mining potential the Lacy Tract had. The dividing lines were frequently drawn across coal seams, which would force miners on one side of the boundary line to stop short of mining the entire seam, while miners on the other side of the boundary line would have to start on entirely new mining operations to mine what remained in the seam.

In the spring of 1977, Raybled Mining Co. began mining area 5, subcontracting the work out to an engineering firm with little experience in coal mining called Hensley Schmidt. The agreement between Raybled and TCA was never reduced to writing. The mining operations quickly failed, ending with a cease order issued by the State of Tennessee in October of 1977 for environmental violations.

While Raybled was still attempting to mine area 5, Peter Feldman hired a mining consultant firm called Ford, Bacon & Davis (FBD) to advise him regarding the mining operations. FBD appointed one of its employees, Miles Walsh, to serve as a mining consultant to Peter. On June 27, 1977, FBD advised Peter that available information was "inadequate for determining the technical and economic feasibility of underground mine development." It advised exploring the feasibility of strip mining. However, strip mining was not attempted because a portion of the surface rights of area 5 were not conveyed to TCA, but were owned by Hiwassy Land Company.

After the State of Tennessee ordered Raybled to cease its underground mining operations, Peter, with the assistance of Miles Walsh, began directing underground mining operations of TCA in late 1977. Peter thus organized Deep Down Mining, Ltd. in December of 1977 to replace Ray-

bled as the contract miner for TCA. In June of 1978, Tennessee Partners, Ltd. acquired the stock of Deep Down Mining and mined 10,000 tons of coal. TCA used the royalty payments from Tennessee Partners to pay the interest on its nonrecourse obligation to K & J. K & J then returned the money to Tennessee Partners. Tennessee Partners ceased operations after FBD concluded in its periodic progress reports that the economics of mining area 5 were in doubt. No further mining was attempted.

TCA's amended federal partnership tax return for 1976 reported a loss of $6,075,-000 resulting from the $6,000,000 in advance royalties paid to K & J and from management and legal fees. TCA's partners then claimed deductions on their federal income tax returns for 1976 for their distributive share of the partnership loss. The Commissioner disallowed the deductions, claiming that the leasing transaction was not entered into with the primary purpose of making a profit. All of the investors in TCA, except Robert Jacobs, contested this determination in the Tax Court.

 The record evidence outlined above amply supports the Tax Court's finding that TCA did not enter into the mineral lease for the primary purpose of making a profit. Moreover Robert Jacobs, John Wolcott, Alan Jacobs and Irving Kanarek were the persons who were substantially involved in structuring the K & J–TCA transaction and operating TCA during 1976. Only Wolcott testified, but he was not questioned on his view in 1976 of the potential profitability of mining the leasehold. Since the burden of showing the requisite profit objective was on the taxpayers, the Tax Court permissibly inferred from their failure to adduce such testimony that their testimony would not have supported their claim that the coal transactions were engaged in for the purpose of making a profit. *See Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), *aff'd.,* 162 F.2d 513 (10th Cir.1947).

### III.

 Alternatively, taxpayers contend that the Tax Court erred in applying the

profit objective test at the level of the limited partnership. They contend that there is evidence that some of the individual investors in the limited partnership had a profit objective as well as a tax objective, and that the case should be remanded for findings with respect to their objective. Conceding that there is some evidence from which investor profit motive might be inferred, taxpayers' argument still must be rejected. The law is settled that the determination of whether an expense is deductible under 26 U.S.C. § 162(a) is controlled by the partnership's motive, not by an individual partner's motive for joining the partnership. *See Tallal v. Commissioner,* 778 F.2d 275, 276 (5th Cir.1985); *Brannen v. Commissioner,* 722 F.2d 695, 703–04 (11th Cir.1984); *Madison Gas & Elec. Co. v. Commissioner,* 633 F.2d 512, 517 (7th Cir. 1980); *Goodwin v. Commissioner,* 75 T.C. 424, 435–36 (1980), *aff'd mem.,* 691 F.2d 490 (3d Cir.1982). The proper focus is on the activities and intent of the individuals who "actually ran all partnership affairs and whose expertise was relied on in making partnership decisions." *Fox v. Commissioner,* 80 T.C. at 1007–08. In a limited partnership such individuals need not always be the general partners. *See, e.g., Fox v. Commissioner, ibid. Cf. Independent Elec. Supply, Inc. v. Commissioner,* 781 F.2d 724, 729 (9th Cir.1986) (rejecting the proposition that the profit motive of a trust should be tested at the beneficiary (investor) level, rather than at the level of the promoters who established the trust).

■ The taxpayers argue that the Tax Court was obliged to determine profit objective at the partnership level by ascertaining the collective purpose and intent of the investors in coming together as partners in TCA. According to them, the limited partners invested in TCA because of their confidence in Peter Feldman's entrepreneurial skills. Consequently, taxpayers fault the Tax Court for determining the issue of profit motive without regard to Peter Feldman or any of the other investors. Although the existence of a profit

objective of a partnership is determined at the partnership level, we note that a partnership is merely a formal entity, and a determination of profit objective can only be made with reference to the actions of those individuals who manage the partnership affairs. *See Fox v. Commissioner,* 80 T.C. 972, 1007–08 (1983), *aff'd mem. sub nom., Kratsa v. Commissioner,* 734 F.2d 6 (3d Cir.1984), *aff'd mem. sub nom., Hook v. Commissioner,* 734 F.2d 5 (3d Cir.1984), *aff'd sub nom., Barnard v. Commissioner,* 731 F.2d 230 (4th Cir.1984), *aff'd mem.,* 742 F.2d 1441 (2d Cir.1984). This method produces a collective intent of the partnership. *Ibid.; see, also Rosenfeld v. Commissioner,* 82 T.C. 105, 112–13 (1984). As the Tax Court noted in *Rosenfeld,* the *Fox* decision "did not preclude an examination of the actions, knowledge or intent of other parties which may establish the requisite, collective intent of the partnership." *Id.* at 113. In addition, the *Rosenfeld* court stated that "a party's individual, investment objectives are not relevant in establishing a profit objective of a partnership. *See Brannen v. Commissioner, supra* at 705–06." *Rosenfeld v. Commissioner,* 82 T.C. at 113. In the instant case, the Tax Court did not misapply the profit objective test at the partnership level by looking to the motives and actions of those individuals that organized, structured and conducted TCA's operations during 1976, namely Robert Jacobs, John Wolcott, Alan Jacobs, and Irving Kanarek. As the Tax Court observed, "the record clearly indicates that none of the partners of TCA, with the exception of Robert Jacobs, took an active role in managing the partnership or developing mining operations."

### III.

The Tax Court's findings of fact are not clearly erroneous, and the court did not err in applying the profit objective test at the limited partnership level.[2] The judgments

---

**2.** The taxpayers' contention that the Tax Court failed to consider the record as a whole, and thus violated the rule of *Imbesi v. Commission-* *er,* 361 F.2d 640, 645 (3d Cir.1966) is entirely without merit.

of the Tax Court will therefore be affirmed.