William G. **BECKER**, Jr. and Patricia B. **Becker**, Plaintiffs,

v.

**INTERNAL REVENUE SERVICE,**
United States of America,
Defendant.

**Civ. A. No. 90–976.**

United States District Court,
D. New Jersey.

Oct. 26, 1992.

---

Carol C. Priest, U.S. Dept. of Justice, Washington, D.C., for plaintiffs.

William G. Becker, Jr., Shanley & Fisher, P.C., Morristown, N.J., for defendant.

## TRIAL OPINION

HAROLD A. ACKERMAN, District Judge:

Plaintiffs William G. Becker, Jr. ("Becker") and Patricia B. Becker[1] instituted this action against the Internal Revenue Service ("IRS") on March 16, 1990 seeking a refund of federal income taxes for the 1982 tax year plus interest.

This action arises from an investment entered into by Becker in a mining venture. The primary issue presented for resolution is whether this investment was a mere sham intended solely to generate tax benefits, or whether it was a *bona fide* transaction entered into with a profit motive.

1. Patricia Becker is Becker's wife and is a party to this proceeding only because she and her husband filed a joint tax return for 1982. Becker was the sole participant in the transactions at issue. I will, therefore, refer to Mr. Becker as the plaintiff.

2. There has been mining activity in the area of the Panamint mine off and on since the late

The matter proceeded to a non-jury trial. In accordance with Federal Rule of Civil Procedure 52(a), I shall now make findings of fact and conclusions of law.

## I. Findings of Fact

Some of the facts have been stipulated and are found accordingly.

### A. *The Investment*

Becker is a highly experienced attorney and a partner in a prestigious law firm in New Jersey. He has been a member of the New Jersey Bar since 1958 and specializes in general complex litigation. Becker has been making investments all his life. In 1982, he was in the 50% tax bracket.

In August 1982, Becker was introduced to an investment opportunity in a silver mine in California, known as Panamint City Mines ("Panamint"), by James Celver. It appears that Celver was acting on behalf of Melby Investments, Inc. ("Melby"), the promoter of the venture. The mine was operated and controlled by Mineop Corporation ("Mineop"), whose president is George Pruett.[2]

Becker recalled meeting with Celver at least three times to discuss the investment. Celver told Becker that he had visited the mine and that in his opinion it would be producing a substantial amount of silver within two to three years. Celver gave Becker various documents concerning the mine, including a prospectus and tax opinion.

The prospectus states several times that a mining venture is extremely speculative, involves a high degree of risk, and should be engaged in only by those who can afford to lose their entire investment. In addition, the "Risk Factors" section of the prospectus provides in relevant part:

1800's. Beginning in 1979, after a rather long period of inactivity, Mineop gained control of various claims. To finance development of the mine, Mineop and Melby entered into an agreement whereby Melby was to find investors and remit the investors' money to Mineop as development capital.

*Lack of Management Experience.* Except for Mr. Pruett ..., none of the Company's [Mineop's] officers and directors have had experience in the management of corporations or businesses of the size and complexity of the Company's business.

*Mining Interest Can Only be Speculative.* Though assay reports have been completed ... and certain pilot operations have indicated an available mineral reserve, no mineral recovery can be guaranteed or even expected in any mining operation. The investor is buying a specific, designated amount of minerals. Tonage [sic] is assigned on a "first come, first serve" basis, and therefore, no quality of claim or quantity of reserves can be determined for a specific investor.... By definition, a mining venture is a high risk, speculative investment only for those who can afford to lose the Offering price herein....

\* \* \* \* \* \*

*Possible Thin Capitalization.* Since this Offering provides a minimum of funds ... and since the Company is planning on revenues from its own silver recoveries, and such income does not yet exist, there is a risk that any investment in this Offering will be in an undercapitalized and underfinanced business, which might, therefore, be unable to deal adequately with adversity.

*Operating Losses.* The Company has had a loss from its operations thus far and has had a working deficit. There is no assurance that the Company will operate profitably in the future, and cash flow, if any, from the mining operations is not anticipated until the end of the third quarter for 1982, but no later than the first quarter of 1983. A failure to realize cash flow from mining production royalties within that period may adversely affect the Company's operations un-

less other sources of financing can be obtained....

\* \* \* \* \* \*

*Unstable Silver Prices.* Silver prices the last fifteen years have been unstable, and we give no predictions. Although no firm conclusions can be drawn about the future, it may be assumed that silver prices will greatly fluctuate until the overall economy is finally stabilized, if ever.

In addition, the prospectus discusses a tax opinion prepared by an attorney. According to the prospectus, the attorney found that the mine "development costs are deductible because the existence of minerals in commercially marketable quantities, [sic] and this has been disclosed through exploratory activities."

Becker received a copy of this tax opinion; he "looked" at some of the cases cited in the opinion and determined that they appeared "to make sense." [3]

As part of the investment materials, Becker also received a one-page document, prepared by Melby, setting forth the benefits to the taxpayer from the investment. The words "Tax Leverage %" are displayed in bold capital letters close to the top of the page. Immediately below this heading, the document indicates that a cash down payment of $5,250, and a note for $15,000 will entitle the investor to "tax benefits" in the amount of $20,000. "Leverage on taxes" is calculated to be 380%.

Further down the page, the potential "Benefits" of the investment are set forth in greater detail. The first benefit listed indicates that the taxpayer's expense deduction for 1982 would be $20,000. Next, the "Profit Potential" for a taxpayer in the 50% tax bracket is set forth. The first item taken into account is the taxpayer's "Dollar Savings on Expense Deduction," which is calculated to be $10,000. Next, the potential value from silver is calculated to be $24,000.[4] The $10,000 expense deduction is added to the potential value of silver, yield-

---

3. Trial transcript ("Tr.") at 8–9.

4. This figure is derived by multiplying the projected quantity of silver the investor is to receive (4,000 ounces) by a projected price of silver ($6.00 an ounce).

ing a total of $34,000. The investor's cash down payment of $5,250 is subtracted from this amount, yielding "Profit on your Original Investment" of $28,750. Curiously, in calculating the investor's potential profit, the document fails to factor in the $15,000 promissory note.

Finally, a letter from Melby addressed to the investor asks:

WHY IS THIS THE BEST SILVER INVESTMENT TODAY?

A cost of $5,000 down, Recourse note of $15,000 @12%, you will net 4,000 OUNCES OF .9995 PURE SILVER, plus your note being paid off from earnings. THE SILVER IS CONSIDERED INVENTORY AND DOES NOT HAVE TO BE DECLARED AS INCOME UNTIL SOLD.

The tax benefits to you in 1982—$20,000 mining expense deduction. This is what you would call "HAVING YOUR CAKE AND EATING IT TOO."

On the basis of his conversations with Celver and his review of the promotional documents, Becker invested in Panamint on September 13, 1982.

As part of the investment, Becker entered into the following contractual relationships: 1) a contract for the purchase from Mineop of a "total of 2,000 tons of silver-bearing minerals, bearing a "net equivalent" [5] of two troy ounces of silver per ton. The purchase price of the silver was $250. 2) a second contract with Mineop for the mining and removal of silver bearing minerals from Panamint. For these services, Becker was to pay $20,000, in the form of an initial cash down payment of $5,000 and a full recourse promissory note for $15,000, payable to Melby. 3) the promissory note (referred to in the mining contract) was payable to Melby, with interest at the rate of 12% per annum. The note provided for yearly interest payments, payable on or before December 31. Principal was payable upon completion of the silver mining or December 31, 1987 (the date the mining contract expired), whichev-

er was sooner. 4) an assignment and security agreement with Melby that provided Melby with full recourse as to principal due on the promissory note. The contract also provided that "[a]s security for this Promissory Note, and for funds loaned to Maker [Becker] against this note, Maker hereby grants to Lender [Melby] a full security interest in Maker's mineral interests and any silver proceeds from said mineral interests belonging to Maker."

At trial, Becker testified that his primary motivation for investing in Panamint was to obtain silver for use as an inflation hedge.

Becker has no expertise in mining activity. Although Becker had made other investments during his lifetime, he had never invested in a mine prior to Panamint. He never conducted an independent investigation of the investment nor did he contact any geologists or mining experts. Instead, Becker relied on the assay reports provided to him by Melby. Becker never visited the mine. The only person he spoke to who had visited the mine was Celver who sold the investment to Becker on behalf of Melby. Indeed, at trial Becker was unable to recall in which state the mine was located.

Becker never contacted any of the directors or officers of Mineop listed in the prospectus, nor did he request to review Mineop's financial records. Becker had never heard of Melby prior to the Panamint investment and did not conduct an independent investigation of Melby. Becker had never met Celver before this investment.

Becker did not engage in any negotiations regarding the price of the investment; it was his understanding that the price was nonnegotiable. Nor did he question Celver about how Melby would know, in July 1982, what his tax benefits would be for the year ending 1982.

## B. Post–Investment Activities

In December of 1982 and 1983, Becker made interest payments on the promissory

---

**5.** "Net equivalent" is defined as the silver bullion received by the investor after all costs of mining are paid.

note of $534 and $1800, respectively. Periodically, Becker received reports either from Melby or from Pruett describing progress on the mine. Becker produced one such report at trial.

In early 1984, Becker received a phone call regarding a lawsuit that had been commenced in Nevada by Melby and some of the other investors in Panamint against Mineop and Pruett for, *inter alia,* breach of mining contract. Becker was invited to join the lawsuit but refused. Becker claims that he did not join in the Nevada litigation since an unfavorable result in that action would be res judicata against him and he would be without any rights against Mineop. The Nevada court eventually found in favor of Mineop and Pruett.

Also in early 1984, a representative of Melby contacted Becker and instructed him not to pay any more interest on the promissory note.

Becker has never received any minerals or silver, nor did he make any request or demand for his silver. He never brought a lawsuit against Mineop, nor did he take any action to be released from his obligation under the $15,000 promissory note.[6] Becker testified that he had no direct knowledge about whether the note had been paid out to Mineop.[7] Becker assumed that the money had been paid over to Mineop because as far as he knew, Mineop never complained about not receiving funding. No one has ever attempted to collect on the note.

### C. Deduction

In 1983, Becker received a proposed Schedule C from Melby, which sets forth the following mine development expenses:

| | | |
|---|---|---|
| mine | – | $2,078 |
| roads, camp, tram | – | $1,030 |
| equipment, rent | – | $ 829 |
| operating expenses, mining | – | $9,610 |
| processing | – | $6,340 |
| Total | | $19,887 |

The schedule also indicated where the taxpayer was to insert his name, social security number, and address. Becker gave the schedule, along with all his other tax materials for 1982, to his accountant who prepared his 1982 tax return. Becker took all the deductions as set forth in Melby's proposed schedule, adding in the December 1982 interest payment. His total deduction amounted to $20,421.

Becker never discussed the propriety of taking this deduction with his accountant. It was his understanding that he was to use the Schedule C as provided by Melby and that either he or his accountant was to fill in his name at the top of the Schedule. Becker testified that he did nothing to verify whether the figures set forth in the schedule were accurate. Rather, he accepted the figures without inquiry. Becker saw nothing unusual about this type of arrangement. At trial, Becker offered no evidence that the alleged mining development costs actually existed[8] or that his money was actually used for those expenses.

### D. Disallowance

In June 1983, the IRS concluded that the tax deduction warranted investigation and assigned Robert Hamilton to the case. Hamilton visited the mine on March 24, 1984 and then prepared a report detailing his findings. At trial, Hamilton testified that Pruett had spent a little over $300,000 constructing the mine. Cable for transporting ore had been installed, a mill had been constructed, and chutes were being repaired. At the time of the visit, however, only two miners were employed due to lack of money from the promoters. According to Hamilton, Pruett had never received any of the money from the investors. Rather, Pruett was paying for the construction and the miners with his own money. Hamilton thus concluded that at the time of his visit

---

**6.** Becker testified that he wanted to take a "low profile" with regard to his potential liability on the note. Tr. at 68.

**7.** In November, 1983, Becker received a notice that the promissory note had been assigned to California Federal Financial.

**8.** Becker testified that he received reports "that there was activity there, that they were doing construction work." Tr. at 53.

the mine was not an operating mine. Although he found that the mine was potentially viable, its viability was contingent on proper funding and completion of development.

On October 8, 1985, the IRS notified Becker that it believed that an adjustment to his tax liability for tax year 1982 was necessary. On October 16, 1987, the IRS issued a Notice of Deficiency to plaintiff, assessing an income tax deficiency of $10,061.00.[9]

In its Notice of Deficiency, the IRS, citing various provisions of the Internal Revenue Code ("I.R.C."),[10] set forth several alternative reasons for disallowing the deduction, including: 1) Becker failed to establish that the venture has economic substance or that it was entered into with a profit motive; 2) Becker had not establish that any bona fide mine development expenses were paid or incurred; 3) Becker had not established that he had any economic interest in the mine for which the existence of ore or minerals in commercially marketable quantities has been disclosed; and 4) Becker failed to establish that any funds were actually paid on the note or that he was "at risk" with regard to the note.[11]

On March 9, 1988, various additions to tax were assessed in the amount of $14,515.37, making the total amount due $24,576.37. Becker paid the full amount of the assessment and now seeks a refund.[12]

9. The $10,061 assessment also encompassed an addition to Becker's income, unrelated to this matter, of $236.

10. All references to the I.R.C. are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.

11. Although the Notice of Deficiency listed additional grounds for disallowance, they have not been pursued by the IRS and therefore will not be considered by the court.

12. Becker seeks a refund of the full amount paid to the IRS less that portion attributable to the unrelated addition to income.

13. Each of these sections of the I.R.C. could arguably support a deduction of Becker's alleged costs incurred with respect to the Pan-

## II. Conclusions of Law

### A. Burden of Proof

Income tax deductions are a matter of "legislative grace." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934). *Smith v. Commissioner*, T.C.Mem. 1986–101. Accordingly, the taxpayer has the burden of proving a deduction. The taxpayer must demonstrate that he comes within the terms of the statute under which he is claiming the deduction. *New Colonial Ice Co.*, 292 U.S. at 440, 54 S.Ct. at 790. A deficiency determination by the IRS is presumed correct and the taxpayer therefore has the burden of proving that it is erroneous. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). A taxpayer may satisfy this burden only by adequately presenting relevant facts and cannot rely on mere assumptions. *Smith*, T.C.Mem. 1986–101.

### B. Merits

In order to qualify for a deduction under §§ 162, 165, 212 or 616 of the I.R.C.,[13] the activity giving rise to the expenditure for which the deduction is claimed must constitute an activity engaged in by the taxpayer with the primary purpose and objective of making a profit. *Horn v. Commissioner*, 90 T.C. 908, 932–33 (1988); *see, e.g., Simon v. C.I.R.*, 830 F.2d 499, 500 (3d Cir.1987) (§§ 162, 212); *Bryant v. C.I.R.*, 928 F.2d 745, 748 (6th

amint investment, although Section 616 (development expenditures) appears to be most relevant.

Section 162 allows a deduction for "all the ordinary and necessary expenses paid or incurred ... in carrying on any trade or business." Section 165 provides for a deduction for any uncompensated loss incurred in a trade or business or in any other transaction entered into for profit. Section 212 allows for a deduction for "all ordinary and necessary expenses paid or incurred ... for the production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income." Section 616 allows a taxpayer to deduct "all expenditures paid or incurred ... for the development of a mine.... if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed."

Cir.1991) (§ 616); *Mahoney v. C.I.R.*, 808 F.2d 1219, 1219–20 (6th Cir.1987) (§ 165); I.R.C. § 183. Before a court may inquire into the taxpayer's primary objective, however, it must first determine whether the transaction was a sham, i.e., whether it lacked economic substance. *Bryant*, 928 F.2d at 748; *Collins v. Commissioner*, 857 F.2d 1383, 1385 (9th Cir.1988). As stated by the Sixth Circuit,

> the question of whether a transaction has economic substance is a threshold issue designed to winnow out the most abusive tax shelters without engaging in the more difficult question of whether a transaction was profit-motivated.

*Bryant*, 928 F.2d at 749. Thus, once a court determines that a transaction is a sham, no further inquiry into intent or motive is necessary. *Kirchman v. C.I.R.*, 862 F.2d 1486, 1492 (11th Cir.1989). In other words, a sham transaction will simply not be recognized for federal tax purposes. *Lerman v. C.I.R.*, 939 F.2d 44, 45 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 590, 116 L.Ed.2d 615 (1991).

■ Whether a transaction is a sham depends on "whether the transaction has any practicable economic effects other than the creation of income tax losses." *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989); *accord Collins*, 857 F.2d at 1385. Thus, a transaction "intended solely to generate tax benefits in the form of deductible losses" is without economic substance and therefore a sham. *Lerman*, 939 F.2d at 52. In making its determination, the court must look at the substance of the transaction and not its form. *Gregory v. Helvering*, 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935); *Lerman*, 939 F.2d at 54. Further, the taxpayer's subjective business purpose, as well as the transaction's economic substance, may be relevant to the sham inquiry. *Bryant*, 928 F.2d at 748.

### 1. *Economic Substance*

■ The facts and circumstances surrounding Becker's investment in Panamint

indicate that the transaction lacked economic substance. The promotional documents reviewed by Becker focused largely on the tax benefits available through the venture. Thus, for example, the one-page document setting forth the investment benefits to the taxpayer highlights the $20,000 tax deduction and $10,000 savings on expense deduction. Although the promotional materials also discuss the profit potential on silver, this must be read in light of the prospectus' emphasis on the highly speculative and risky nature of silver mining.

■ The structure of the actual transaction entered into by Becker also indicates lack of economic substance. "The presence of deferred debt that is in substance or in fact not likely to be paid is an indicium of lack of, or exaggeration of, economic substance." *Horn*, 90 T.C. at 938. Thus, even if a promissory note is full recourse on its face, it is the substance, not the form that controls. *Id.* "The law is clear that courts may look behind a paper facade to find the actual substance and economic realities of the transactions." *Id.* at 939.

On its face, the promissory note executed by Becker was full recourse as to principal only and prescribed a fixed rate of interest. In addition, the note was secured by the mineral interests and silver proceeds—which under the circumstances were nothing more than "illusory security." *Id.* at 938. Becker made only two interest payments on the note and discontinued making payments at the direction of the promoter of the mining venture. Although under the terms of the note, principal and the remaining interest became due in 1987, Becker has made no further payment on the note. Finally, no one has ever attempted to collect on the note. "Under these circumstances, it does not appear that [the taxpayer] had a legitimate obligation or incentive to repay the note or to pay the interest due on the note." *Davis v. Commissioner*, T.C.Mem. 1989–635.[14]

---

**14.** Becker testified that he believed he was fully at risk under the note. However, I find this testimony incredible. Among other things,

Becker never took any steps to protect himself from liability under the note.

In addition, it is doubtful whether any amounts were in fact borrowed under this loan arrangement with Melby and Mineop. Becker has not established that Melby paid any money to Mineop. Instead, the testimony of Hamilton, the IRS investigator, indicates that Pruett never received any of the investors' money from the promoters and that the construction that had taken place was paid for with his own money.[15] Under these circumstances, I find that the note, recourse in form, was in fact worthless. *See Horn,* 90 T.C. at 938 (describing similar loan arrangements as "worthless pieces of paper").[16]

The fact that Becker made two interest payments on the note does not dictate a different conclusion. In early 1984, Becker stopped making payments at the instruction of Melby. In any event, I conclude in light of all the facts and circumstances surrounding the loan arrangement that the two interest payments constituted " 'window dressing'—an attempt to give the note[ ] the appearance of a substance that just did not exist." *Horn,* 90 T.C. at 939.

Another indication that the transaction was a sham is that Mineop was never adequately capitalized to conduct mining operations. From the outset, Mineop was operating at a loss and had a work deficit.

Also indicative of a sham transaction is the Schedule C distributed by Melby, setting forth the alleged mine development expenses. Becker simply turned the schedule over to his accountant who prepared his tax return. Becker never discussed the propriety of taking a deduction with his accountant nor did he do anything to verify that the figures set forth in the schedule

were accurate. At trial, Becker failed to provide any evidence, other than his own testimony, that the purported mining development costs actually existed.

The final indication that the Panamint investment had no economic substance is that, in the end, Becker never received any minerals or silver.[17]

Becker argues that his investment in Panamint was a bona fide transaction, inasmuch as the mine was a "potentially profitable operation" and had proven mine reserves. Becker's argument, however, misses the mark. The critical inquiry is whether the *transaction* entered into by Becker had economic substance, not whether the mine itself could potentially produce silver at some future date and yield a profit.

In sum, I find that Becker has failed to prove that the transaction had economic substance.

### 2. *Business Purpose*

■ Although Becker testified that he was motivated by profit, this contention is not supported by the record. Rather, the record demonstrates a general indifference to the prospects of making a profit from the venture. Becker is a highly experienced attorney and has been a member of the New Jersey Bar for many years. Yet, he entered into an investment in a highly speculative and risky mining venture based solely on a few conversations with Celver, the promoter's agent, and a review of the documents provided to him by Celver.

The prospectus warned Becker over and over about the speculative and risky nature of mining, the instability of silver prices,

---

**15.** Becker contends that Melby, at least until December 1983, was giving money to Mineop and attempts to prove this by pointing out that to his knowledge, Mineop never complained about not receiving the investors' funds. However, this contention is refuted by Hamilton's testimony, which the court finds credible.

**16.** The Nevada court found that Mineop at some point used the plaintiffs' notes as collateral to obtain a loan from California Federal Financial. *See Melby v. Mineop Corp.,* No. 14985 (Nev.Dist. Ct. Dec. 4, 1985). However, this fact alone does not establish that *Becker* had a *bona fide* obli-

gation to repay his loan. Moreover, neither Becker nor the IRS were parties to that action.

**17.** Becker argues that the reason he never received any silver is because a storm washed out one of the roads leading to the mine in late summer 1984. The evidence indicates, however, that as of 1984, two years after Becker first entered into the investment, the mine was still not in operation and that the development of the mine was not being properly funded. Thus, even if there had never been a storm or other "Act of God," Becker nevertheless would not have received any silver.

and about Mineop's thin capitalization, operating losses, and lack of management experience. Becker had no expertise in mining and had never invested in a mine before. Yet he failed to conduct any independent investigation of the investment and never consulted a mining engineer or geologist.[18] Becker never visited the mine, nor did he send anyone to visit the mine. The only person he spoke to who had visited the mine was Celver. Indeed, at trial Becker was unable to recall in which state the mine was located.

Becker never contacted any of the directors or officers listed on the prospectus. Nor did he request to review Mineop's financial records. Although Becker had never heard of Melby, he failed to conduct an independent investigation of Melby. Becker had never met Celver before this investment. In light of these factors, I find that Becker's reliance solely on Celver's statements and on the offering documents furnished by Melby simply was not reasonable. *See Horn,* 90 T.C. at 936.

Becker's conduct is strikingly similar to that of the taxpayers in *Patin v. Commissioner:*

> The record demonstrates petitioners' complete indifference to the gold program's chances for economic success. We note that none of the petitioners had any experience in gold or silver mining, nor were they actively involved in carrying out the program in which they invested. We, therefore, find significant the fact that petitioners chose to rely exclusively on the promoters' representations concerning the quantity and quality of ore reserves at [the mine property].
>
> \* \* \* \* \* \*
>
> Petitioners are all sophisticated businessmen. We simply do not believe that they would enter into profit-motivated transactions with an unknown party and rely solely on the representations of such party with respect to the most crucial aspect affecting the viability of the proposed venture. Only the promised six-to-one tax deduction can adequately explain petitioners' entry into the gold program under such circumstances.

88 T.C. 1086, 1118–19 (1987), *aff'd, Hatheway v. Commissioner,* 856 F.2d 186 (4th Cir.1988), *Skeen v. Commissioner,* 864 F.2d 93 (9th Cir.1989), *Gomberg v. Commissioner,* 868 F.2d 865 (6th Cir.1989).

Nor does Becker's conduct following his investment indicate a business purpose. To the contrary, his conduct further evinces a complacent attitude towards Panamint's chances for success.

For example, Becker did not join the lawsuit brought by Melby and some of the investors against Mineop.[19] Becker never made any request or demand for his silver, even after he learned of the lawsuit. He never brought a lawsuit himself, nor did he take any action to be released from the obligation under the note. Becker, in sum, took a very passive role with regard to his investment.

Becker argues that he kept in contact with the attorneys who were prosecuting the Nevada action, thus evincing business purpose. I disagree. Becker's "occasional inquiry into the activities of [the promoters] and [the mining company] rose merely to the level of curiosity, and certainly did not reflect the level of concern which would normally attend a business activity and subsequent potential loss of a substantial investment." *Patin,* 88 T.C. at 1122.

Becker also points to the relatively high prices of silver in the years both preceding and following 1982 and argues that investing in precious metals has been historically regarded as a hedge against inflation.

---

**18.** Becker testified that he relied on the assay reports provided to him by Melby. However, the court finds it improbable that Becker, who is admittedly inexperienced in mining, would have relied solely upon the assay report furnished by Melby if he was seriously motivated by making a profit, "particularly in light of the risks detailed in the 1982 offering circular." *Horn,* 90 T.C. at 935.

**19.** Becker claimed that he did not join the lawsuit because an unfavorable result in that case would be res judicata against him. Yet although the outcome was, in fact, unfavorable, Becker nevertheless did nothing to enforce his rights with respect to the silver.

However, while silver mining in general may have been attractive to investors seeking economic benefits, this does not change the conclusion that this particular venture was intended to produce, and that Becker was motivated by, tax benefits. *See Simon v. Commissioner*, T.C.Mem. 1986–156, *aff'd*, 830 F.2d 499 (3d Cir.1987).

Becker also relies heavily on the report of the IRS investigator who found that Panamint mine was a "potentially profitable operation," and the opinion of the Nevada court to similar effect.[20] Neither Hamilton's report nor the Nevada court's opinion, however, were available to Becker at the time he was deciding to invest in the mine. Becker instead relied solely on the representations made by Celver and the offering documents..

Based on all these findings, I conclude that Becker has failed to demonstrate that he invested in Panamint with a business purpose.

I therefore conclude, based on all the facts and circumstances, that Becker's investment was intended solely to generate tax benefits. As such, the investment was a sham and should not be recognized for federal tax purposes. Becker's deductions were correctly disallowed by the IRS.[21]

### C. Additions to Tax

In addition to disallowing the deduction, the IRS imposed various additions to tax under I.R.C. §§ 6653(a)(1), 6653(a)(2), 6661, and 6621. I will now consider these additions in turn.

#### 1. § 6653(a)

 Section 6653(a) provides for an addition to tax, or penalty, where any part of an underpayment of tax is due to "negligence or intentional disregard of rules and regulations."[22] The determination of the IRS is presumptively correct and the taxpayer has the burden of proving that the addition is erroneous. *Collins*, 857 F.2d at 1386; *Horn*, 90 T.C. at 941.

 Under Section 6653(a), negligence is defined as the "lack of due care or failure to do what a reasonable and ordinary prudent person would do under the circumstances." *Horn*, 90 T.C. at 941–42. In making this determination, the court may consider the taxpayer's education and intelligence. *Vick v. Commissioner*, T.C.Mem. 1984–353.

 Here, Becker, an experienced attorney who has admitted to making many investments, invested in Panamint based solely on his review of the offering documents furnished by Melby and on his conversations with Celver. Although the prospectus warned of the highly speculative and risky nature of the venture, Becker failed to consult an expert, or make any independent investigation of the venture or the promoters. Under these circumstances, I find that Becker failed to act like a reasonable person making a business decision. *See Zmuda v. C.I.R.*, 731 F.2d 1417, 1422 (9th Cir.1984) (taxpayer has duty to make reasonable inquiry before investing). I therefore find that Becker is liable for the additions to tax under Sections 6653(a)(1) and 6653(a)(2) as determined by the IRS.

#### 2. Section 6661

 Section 6661 imposes an addition to tax where there has been a substantial understatement of income tax. An under-

---

20. The Nevada court found that the "enterprise was a legitimate business venture which presented a viable potential opportunity of substantial gain for Plaintiffs and Defendants alike." The court also found, however, that "[t]he primary benefit of the investment as presented to [the investors] was a legitimate means of tax avoidance." *See Melby*, Case No. 14985.

21. Having found that the Becker's investment in Panamint was a sham, the court need not consider the remaining grounds for disallowing his tax deduction.

22. The amount to be added to the tax is 5% of the underpayment (§ 6653(a)(1)), plus an amount equal to 50% of the interest payable under Section 6601 with respect to the portion of the underpayment which is attributable to negligence or intentional disregard. § 6653(a)(2). The addition of the tax under Section 6653(a)(2) is to be imposed for the period beginning on the last day prescribed by law for payment of the underpayment, and ending on the date of the assessment of the tax. § 6653(a)(2)(b).

statement is substantial when it exceeds the greater of $5,000 or 10% of the amount of tax required to be shown on the tax return.[23]

Where the underpayment involves a tax shelter, the understatement can be reduced by an amount attributable to the tax treatment by the taxpayer if there is or was substantial authority for such treatment, and the taxpayer reasonably believed that such tax treatment was more likely than not the proper treatment. § 6661(b)(2)(c).

A taxpayer will be deemed to have had a reasonable belief that the tax treatment was proper if, after analyzing the relevant facts and authorities, the taxpayer reasonably concluded that there was a greater than 50% likelihood that the tax treatment would be upheld in litigation, or if the taxpayer in good faith relied on the opinion of a professional tax advisor, provided that the opinion was based on an analysis of the relevant facts and authorities. Treas.Reg. 1.6661–5(d).

For the reasons stated above, I have determined that the mining venture was a sham. "The Supreme Court has held for many years that claims based on unreal and sham transactions are not recognizable for tax purposes." *Horn,* 90 T.C. at 943 (*citing Gregory,* 293 U.S. 465, 55 S.Ct. 266; *Higgins v. Smith,* 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940)). Becker has failed to present any authority, let alone substantial authority, for his treatment of the alleged mine development expenses, nor has he demonstrated a reasonable belief that such treatment was proper. I therefore find that the assessment of an addition to tax under Section 6661 was appropriate.

### 3. *Section 6621(c)*

 Section 6621(c) provides for the imposition of increased interest where there has been a substantial underpayment attributable to a "tax-motivated transactions." A "sham" is explicitly included within the definition of a tax-motivated

transaction. § 6621(c)(3)(A)(v). Under Section 6621(c), a sham is defined as a transaction without economic substance. *Horn,* 90 T.C. at 944.

For the reasons stated above, I have determined that Becker's investment in Panamint was a mere sham, devoid of economic substance. I therefore find that the assessment of interest was appropriate.

Conclusion

For all the foregoing reasons, I find that Becker has failed to demonstrate his entitlement to a deduction based on his investment in Panamint and that the IRS therefore properly disallowed Becker's deduction of $20,421.00. I also find that under the facts and circumstances, the additions to tax imposed on Becker in the amount of $14,515.37 were appropriate.

**23.** The amount of the addition is equal to 10% of any underpayment attributable to the under- statement.