In re Thomas A. **BOCH**, and Linda Jo Boch, d/b/a Boch Chiropractic Clinic, Debtors.

Thomas A. **BOCH**, and Linda Jo Boch, d/b/a Boch Chiropractic Clinic, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

Bankruptcy No. 1–89–01474.
Adv. No. 1–90–0078.

United States Bankruptcy Court, M.D. Pennsylvania.

Feb. 12, 1993.

Harry Giacometti, Tax Div., U.S. Dept. of Justice, Washington, DC, for U.S.

William F. Lawless, Altamonte Springs, FL, for Boch.

## MEMORANDUM

ROBERT J. WOODSIDE, Chief Judge.

In this adversary proceeding, I have been asked to determine for purposes of Section 506(a), 11 U.S.C., the value of tax liens asserted by defendant United States of America, Internal Revenue Service (the "Government") against debtor Thomas A. Boch ("Boch"), individually, and against debtors Boch and Linda Jo Boch ("Debtors") jointly with respect to federal tax debt from the years 1980 through 1985. Also at issue is the dischargeability of the Debtors' tax debt. For the reasons set forth below, the value of the Government's secured claims will be deemed to be $57,-000.00, with respect to Debtors' residence, $46,762.00 with respect to Debtors' personal property, accounts receivable and investment limited partnership, and an additional $55.00 with respect to Boch's individual

property; Boch's tax debts will be deemed to be nondischargeable; and the tax debt of Linda Jo Boch will be deemed to be dischargeable.

### Procedural history

On October 30, 1989, Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code. The Government filed a proof of claim on February 16, 1990, in the amount of $431,270.70. *See* Transcript of January 17–18, 1991 proceedings ("N.T."), Ex. P–14. The proof of claim encompassed Debtors' federal income tax liabilities, including interest and penalties, for the years 1980 through 1985.

On April 16, 1990, Debtors commenced the instant adversary proceeding, seeking to determine the validity and extent of liens asserted by the Government and the dischargeability of their tax debt. On January 17 and 18, 1991, I heard evidence in the adversary proceeding. On August 26, 1991, seven months after trial, the Government filed a motion to supplement the record with several tax forms that had been requested by Debtors in discovery prior to trial but which had not been produced. I denied the Government's motion by Order dated September 20, 1991. The parties have submitted multiple briefs and these matters are ready for disposition.

### Factual findings

1. At all times relevant to this action, Boch was a self-employed chiropractor. N.T., at 41.

2. In 1977, 1978 and 1979, Boch filed federal income tax returns. N.T., at 154, 191–92, Ex. D–21.

3. In January, 1981, Boch received notification from his accountant that Debtors owed approximately $1,000.00 in taxes in connection with their 1980 tax return. N.T., at 212. Because he felt that Debtors' financial condition was poor, Boch did not file an income tax return on Debtors' behalf or pay amounts due and owing to the Government. N.T., at 213, 243, 255–56.

4. Shortly after this initial decision not to pay taxes, Boch reviewed an advertisement in the "American Chiropractor" journal entitled "The Giant Joke! Income Tax is Voluntary." N.T., at 213, 242. The advertisement asserted, *inter alia,* that individual United States citizens were not required to file tax returns or pay income taxes. *Id.* at 214, 248, 256, Ex. D–26. The advertisement was placed by Belanco Liberation Foundation or Belanco Religious Order ("Belanco"). *See also* N.T., at D–26.

5. In the spring of 1981, Boch became affiliated with Belanco, organized by Paul Bell from Bakersfield, California. N.T., at 212. Boch had several meetings with representatives of Belanco. N.T., at 244–45. Bell offered legal protection to Boch in his efforts not to file income tax returns or pay income taxes. N.T., at 244.

6. Boch did not file returns or pay income taxes for the next several years. In September, 1983, an agent of the Internal Revenue Service attempted to interview Boch and informed him that he was the subject of a criminal investigation related to his failure to pay taxes for the years 1980 through 1982. N.T., at 192–93.

7. Shortly thereafter, Boch contacted Travis Brownlee. N.T., at 193, 205. Brownlee is a known tax protestor. N.T., at 174. Brownlee visited Boch in Harrisburg, and assisted Boch in devising a sham agreement that purported to set up an offshore trust known as Allfunds Company ("Allfunds"). N.T., at 177–78, 194, 196, Exs. D–13–15. The purpose of purporting to set up a trust was to provide a mechanism whereby Boch could claim that interest payments were made to the trust that would offset his income should it be necessary for him to file an income tax return. N.T., at 193–97.

8. Although Boch signed the trust instrument in late 1983, the agreement was back-dated to February 26, 1981. N.T., at 199. The purpose of back-dating the agreement was to provide false documentation of interest expense from 1981 in the event that Boch subsequently filed income tax returns for that period. N.T., at 200.

9. Boch provided Brownlee with income figures to enable Brownlee to structure sham interest payments sufficient to offset

his income. N.T., at 205, Ex. D–22. The interest payments were established through false loan and mortgage agreements. N.T., at 196. For example, Boch entered into a $300,000.00 installment loan agreement with Allfunds to provide documentation to support interest payments that might be claimed; however, no money was exchanged between Boch and Allfunds. N.T., at 176, 195–96; Ex. D–14. Boch executed a mortgage in the amount of $300,000.00 although the property purportedly subject to the mortgage was valued at approximately $100,000.00 and already was encumbered. N.T., at 203.

10. Although Boch was not filing income tax returns during this period, the Allfunds transaction was set up to justify Boch's failure to pay taxes in the event that returns subsequently were filed. N.T., at 197. At trial, Boch was aware that if he would have filed a return claiming interest expense based upon the Allfunds transaction, such a return would have been fraudulent. N.T., at 198.

11. Boch also obtained a number of blank receipts from Brownlee and filled them out, although no money changed hands as reflected in the receipts. N.T., at 181–82, 200–02, Ex. D–17. The purpose of the receipts was to provide documentation for the false interest expense. *Id.*

12. Boch titled a number of Debtors' vehicles in the name of Allfunds. N.T., at 183–84, 207–08, 245, Ex. D–18. Boch advised Brownlee that he had titled at least one vehicle in the name of Allfunds. N.T., at 205–06, Ex. D–22.

13. Also in late 1983, Boch became a member of the National Commodity and Barter Exchange ("NCBE"), also known as Club 110. N.T., at 209–10. NCBE purports to be an organization dedicated to assisting individuals in concealing income from taxing agencies. N.T., at 167–68, 211, Ex. D–11, D–23–D–24. Boch endorsed at least $20,000.00 in checks over to NCBE or Club 110. N.T., at 169–172, 219.

14. In 1983 through 1984, on numerous occasions, Boch exchanged a number of patient checks for cash, N.T., at 166, 261, and each time subsequently would deposit

in his accounts a slightly smaller amount of cash. N.T., at 165, 272. Boch utilized $9,600.00 in patient checks to fund construction of a swimming pool. N.T., at 66–67, 166.

15. In the spring of 1984, Boch broke off his association with Brownlee. N.T., at 221–23, Ex. D–16.

16. Shortly thereafter, Boch consulted David Skinner, an ex-IRS agent and obtained legal counsel. N.T., at 223–24. In February, 1985, Skinner advised Boch that it was likely that the Government would obtain a warrant for a search of Boch's offices. N.T., at 224–25.

17. The Government did search Boch's office, and seized a number of records. N.T., at 267, Ex. D–19. These included NCBE documents, N.T., at 167–71, Exs. D–10–11, the Allfunds loan documents, N.T., at 177, a letter to Brownlee, N.T., at 179, Ex. D–16, and the receipts relating to the interest expense, N.T., at 181–82, Ex. D–17. Based upon the information from Skinner, prior to the search, Boch removed a number of patient records and payment records from his offices. N.T., at 227–30.

18. The Government also obtained summonses with respect to Farmers Trust Bank, Boch's bank, and insurance carriers that had paid Boch for patient services. N.T., at 257–60. Boch obtained a form motion to quash from Brownlee and attempted to quash the summonses, but was unsuccessful. *Id.*, Ex. D–18. The Government collected a number of receipts from insurance companies and patients from 1980 through 1984 that substantiated the fact that Boch had substantial income. N.T., at 163. In 1981, Boch had income of approximately $15,304.00, in 1982, $72,-454.85, in 1983, $143,245.27, and in 1984, $200,619.00. N.T., at 190–91, Ex. D–20.

19. Forms 1040, Joint Federal Income Tax returns for the years 1983, 1984, and 1985, were filed on behalf of Debtors on February 3, 1987. N.T., at 85, Exs. P–6–P–8, Court Ex. 1, Stipulation ¶ 6.

20. Forms 1040X, Amended Federal Income Tax returns for the years 1984 and 1985, were filed on behalf of Debtors on

February 3, 1987. N.T., at 75, 255, Exs. P–10–P–11, Court Ex. 1, Stipulation ¶ 7.

21. On March 7, 1987, as a result of a plea agreement, Boch was convicted of failure to file an income tax return for one year. N.T., at 259–60, Ex. D–30. In the judgment and probation/commitment order, Boch was directed to cooperate with the Government, serve a three month prison sentence, perform 600 hours of community service, and pay a $10,000.00 fine. N.T., at 187, 260, Ex. D–31. He currently is on probation. N.T., at 260.

22. A Form 1040X, Amended Federal Income Tax return for the year 1983 was filed on behalf of Debtors on December 14, 1987. N.T., Ex. P–9, Court Ex. 1, Stipulation ¶ 8.

23. Forms 1040, Joint Federal Income Tax returns for the years 1980, 1981, and 1982, were filed on behalf of Debtors on December 22, 1987. N.T., at 78, Exs. P–3–P–5, Court Ex. 1, Stipulation ¶ 4.

24. On February 26, 1988, Boch signed a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment with respect to fraud penalties asserted pursuant to Section 6653(b), 26 U.S.C., for the years 1980 through 1985. N.T., Ex. D–33, Court Ex. 1, Stipulation ¶ 10.

25. On February 26, 1988, Debtors signed a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment with respect to income tax liabilities and statutory additions for the years 1980 through 1985. N.T., Ex. D–33, Court Ex. 1, Stipulation ¶ 11.

26. Boch was audited by the Government, but the audit did not increase his federal tax liability. N.T., at 76, 254.

27. The Government filed a Notice of Federal Tax Lien in Boch's name on October 20, 1988, with the Prothonotary for the Court of Common Pleas, Cumberland County, Pennsylvania, in the amount of $104,588.04, for unpaid tax liabilities for the years 1980 through 1985. N.T., at 345, Ex. P–13, Court Ex. 1 ¶ 1.

28. The Government filed a Notice of Federal Tax Lien in the name of Debtors on April 27, 1988, with the Prothonotary for the Court of Common Pleas, Cumberland County, Pennsylvania, in the amount of $256,336.46, for unpaid tax liabilities for the years 1980 through 1985. N.T., at 345, Ex. P–12, Court Ex. 1 ¶ 2.

### Discussion

In the instant complaint, Boch has requested a determination of the value of the Government's secured claim for purposes of Section 506(a), 11 U.S.C., and a determination as to the dischargeability of Debtors' tax debt. Boch asserts that the Government's liens are erroneous and invalid, and that the Government has failed to establish "willful evasion" on his part such as would warrant a determination of nondischargeability. The validity of the Government's liens, the amount of the Debtors' tax debt, the value of the Government's secured claims, and the dischargeability of Debtors' tax debt are discussed separately below.

A. The validity of the Government's liens.

■ Boch contests the validity of the Government's liens, alleging that the liens are based upon invalid assessments. Pursuant to Section 6203, 26 U.S.C., an assessment properly is made "by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary...." The applicable regulations provide that an assessment is made when an IRS officer signs a Form 23C summary record of assessment. *See* 26 C.F.R. § 301.6203–1 (1982); *see also See Geiselman v. United States*, 961 F.2d 1, 5 (1st Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 261, 121 L.Ed.2d 191 (1992).

■ "A valid assessment pursuant to § 6203 may be established by a document entitled 'Certificate of Assessments and Payments,' (a 'Form 4340') signed by an IRS officer." *Carroll v. Chivatero*, 1990 WL 118766, *slip op.* (N.D.Ohio 1990) (citations omitted). "The indication on the Certificate of '23C date' is sufficient evidence

that a Form 23C (the summary of assessments for a particular date) was signed on that date." *Id.; see also United States v. Dixon*, 672 F.Supp. 503, 505–06 (M.D.Ala. 1987), *aff'd*, 849 F.2d 1478 (11th Cir.1988). Thus, such certificates of assessments and payments routinely are used in proving that tax assessments are made. *Guthrie v. Sawyer*, 970 F.2d 733, 737 (10th Cir. 1992); *Geiselman*, 961 F.2d at 6. Such certificates constitute presumptive proof of a valid assessment. *See generally United States v. McCallum*, 970 F.2d 66, 68 (5th Cir.1992) (finding that Form 4340 certificates of assessments and payments established that Form 23C certificates were signed); *Gentry v. United States*, 962 F.2d 555, 558 (6th Cir.), *aff'd*, 962 F.2d 555 (6th Cir.1992); *United States v. Chila*, 871 F.2d 1015, 1017–18 (11th Cir.1989), *cert. denied*, 493 U.S. 975, 110 S.Ct. 498, 107 L.Ed.2d 501 (1989).

The presumption of validity that attaches to assessments is not often rebutted by alleged defects in procedure. As stated by one court:

> It is well settled that the IRS's tax assessments are presumed to be correct and it is the taxpayer who must rebut this presumption. Only in rare cases can this presumption ... be overcome by destroying the assessment's foundation. Generally a court will not look behind an assessment 'to evaluate the procedure and evidence used in making the assessment.' As long as the procedures and evidence upon which the government relies to determine the assessment have a rational foundation, '*the inquiry focuses on the merits of the tax liability, not on the IRS procedures.*'

*Curley v. United States*, 791 F.Supp. 52, 54 (E.D.N.Y.1992) (citations omitted; emphasis added).

In *Geiselman v. United States*, 961 F.2d at 4–5, the government, seeking to prove a valid assessment, offered into evidence a Form 4340 but did not offer a Form 23C. Based on the introduction of the Form 4340, the court found a valid assessment. The court stated:

[plaintiff's] argument that the 'Form 4340 itself, cannot prove a valid assessment was executed,' falls beneath the weight of authority. Certificates of Assessments and Payments are 'routinely used to prove that tax assessment has in fact been made.' They are 'presumptive proof of a valid assessment.' Absent any proof to the contrary, the district court had more than sufficient reason to conclude that the IRS had made assessments against [plaintiff]; it had no reason to conclude otherwise.

*Id.* (citations omitted).

Section 6321, 26 U.S.C., creates a lien upon the property of a taxpayer who fails to pay taxes. *See Egbert v. United States*, 752 F.Supp. 1010, 1014–15 (D.Wyo. 1990), *aff'd*, 940 F.2d 1539 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 666, 116 L.Ed.2d 756 (1991). Section 6321 states:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with costs that may accrue in addition thereto), shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

The only prerequisites to a valid lien are for the Government to satisfy the notice requirement set forth at Section 6303(a), 26 U.S.C., and properly demand payment. *See Egbert*, 752 F.Supp. at 1015; *In re Elliott*, 67 B.R. 866, 869 (Bankr.D.R.I.1986) (stating that under Section 6321, "in order to create a valid tax lien, it is only required that the person liable for the tax neglects or refuses to pay, after IRS has made demand for payment"). The lien then is perfected when the IRS files a notice of lien pursuant to Section 6323(f)(1)(A)(ii), 26 U.S.C. *Elliott*, 67 B.R. at 869. Such a lien arises at the time of an assessment. *See* 26 U.S.C. § 6322; *see also Carroll, slip op.; Geiselman*, 961 F.2d at 6.

In this case, the Government established its prima facie case of valid assessments by presenting presumptive proof in the form of Forms 4340. *See* N.T., at 335–38, Exs.

35–36. The Forms 4340 were admitted into evidence with no objection from Boch. N.T., at 335–36. A revenue officer testified as to the information contained in the Forms 4340. N.T., at 335–38. Boch has done nothing to rebut the presumption raised by the submission of the Forms 4340, but merely contends that the Government's proof is insufficient because they did not submit Forms 23C. *See* N.T., at 365–67.

The most troubling aspect of the Government's case is its failure to produce at trial the actual Forms 23C, despite repeated discovery requests by Boch.[1] Boch contends that the Government's failure defeats its prima facie case of valid assessments. This identical issue was before the court in *Carroll, slip op.* There,

> the plaintiff argue[d] that [a] levy ... [was] without statutory authority by reason of the [government's] failure to follow the statutory procedures for making an assessment. The plaintiff base[d] that argument in large measure on the failure of the IRS to provide him with a copy of the Form 23C as proof of the assessment, despite the plaintiff's repeated requests for such information.

*Id.* at 6. Despite the government's failure to produce the Form 23C, the court upheld the assessment at issue as valid based upon the submission of the Form 4340. The court stated that:

> [w]ith respect to the plaintiff's contention that he has not been provided with a copy of the assessment, and that there is no proof that a valid assessment was made prior to the levy on his wages, the court finds this contention to be without

merit. Exhibit C to the defendants' motion for summary judgment is a certified copy of the plaintiff's transcript of account, the Form 4340, Certificate of Assessments and Payments. That document shows that an assessment was made on March 30, 1987, as indicated by the "23C Date" listed on the form. *The "23C Date" on a signed Certificate of Assessments and Payments is sufficient evidence of a valid assessment of a tax on that date.*

*Id.* at 7 (emphasis added).

■ Similarly, in this case, other than the absence of Forms 23C in evidence, Boch has not raised any other ground to challenge the validity of the Government's assessments. Therefore, in accordance with the authorities discussed above, the Government's assessments against the Debtors will be deemed valid based upon the Forms 4340 and associated testimony. Additionally, pursuant to the Forms 4340, the Government established that it demanded payment of delinquent tax debt from Debtors.[2] Accordingly, valid liens arose in favor of the Government with respect to the individual debts of Boch and the joint debts of Debtors. *See supra* pp. 652–53. The Government perfected those liens on October 20, 1988, and on April 27, 1988, respectively. *See supra* p. 651, Factual findings ("FF") ¶¶ 27–28.

**B. The amount of Boch's tax debt.**

■ Boch next suggests that the amounts of the Government's assessments against Debtors are erroneous. However, a tax assessment by the Government is

---

1. The government ultimately did attempt to proffer Forms 23C into evidence seven months subsequent to trial in this case. Due to the untimely nature of the submission, I rejected the government's motion to supplement the record. *See supra* p. 649.

2. The provision of notice and demand also were established in the testimony of a revenue officer, N.T., at 340–41, and under "the presumption of official regularity" to which the government is entitled. *See Amber Truck Lines v. United States,* 805 F.Supp. 32, 34 (D.Utah 1992). Pursuant to this presumption, "in the absence of

clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties." *Id.* (quotation omitted). Certification of the notice and demand by an IRS officer on the Forms 4340 makes this presumption more compelling. *Compare id.* (noting that certification of IRS officer of notice and demand on a Notice of Federal Tax Lien "makes the presumption that notice was made even more compelling"); *Bassett v. United States,* 782 F.Supp. 113, 115 (M.D.Ga.1992) (noting that "Certificates of Assessments and Payments are presumptive proof that proper Notice and Demand were made by [the government]").

presumptively correct.[3] *United States v. Purcell*, 798 F.Supp. 1102, 1110 (E.D.Pa. 1991) (citing *United States v. Vespe*, 868 F.2d 1328, 1331 (3d Cir.1989), *aff'd*, 972 F.2d 1334 (3d Cir.1992); *Sullivan v. United States*, 618 F.2d 1001, 1008 (3d Cir. 1980)). The Government may establish a prima facie case of an accurate assessment by offering into evidence the Form 4340 Certificate of Assessments and Payments for the tax years in question. *Id.; see also Smelley v. United States*, 806 F.Supp. 932, 934 (N.D.Ala.1992) (stating that "the Certificate [of Assessments and Payments] establishes the presumptive correctness of the tax assessments and a prima facie case of liability"); *United States v. Carson*, 741 F.Supp. 92, 94 (E.D.Pa.1990) (stating that "[t]he Certificate of Assessments and Payments establishes a presumption that the assessments are valid"); *United States v. Nuttall*, 713 F.Supp. 132, 135 (D.Del.) (stating that "[a] presumption of correctness attaches to assessments as detailed in the Form 4340"), *aff'd*, 893 F.2d 1332 (3d Cir. 1989). The taxpayer then bears the burden of persuasion by a preponderance of the evidence that a particular assessment is erroneous.[4] *Purcell*, 798 F.Supp. at 1110; *Carson*, 741 F.Supp. at 94; *Nuttall*, 713 F.Supp. at 135.

■ In this case, the Government's assessments include several statutory additions to tax. Such determinations by the Government also are presumptively correct, and the taxpayer bears the burden of demonstrating that the addition is erroneous. *See Becker v. IRS*, 804 F.Supp. 658, 668 (D.N.J.1992).

Through the testimony of revenue officers and the proffer of Forms 4340, the Government established the amount of the Bochs' tax liability at trial. *See* N.T., at 315–24, 350–54, Exs. D–33, 35–D–36. As to Boch, individually, as of March 17, 1988, the Government's proofs presumptively established tax liabilities arising from assessments of civil fraud penalties pursuant to Section 6653(b), 26 U.S.C., and various substantial underreporting penalties, pursuant to Section 6651, 26 U.S.C., including interest through March 17, 1988, to be as follows:

| Year | Amount Assessed | Balance |
|------|------|------|
| 1980 | $ 2,251.00 | 0 |
| 1981 | 1,480.00 | 0 |
| 1982 | 5,207.00 | $ 3,564.22 |
| 1983 | 24,718.13 | 24,718.13 |
| 1984 | 42,496.29 | 42,496.29 |
| 1985 | 28,435.62 | 28,435.62 |
| | | $99,214.62 |

N.T., at 315–24, Exs. D–33, D–34, D–36.

As to the Bochs jointly, as of approximately March 17, 1988, the Government's proofs presumptively established the outstanding tax liabilities that arose from audit deficiencies and related penalties, including interest through March 17, 1988, to be as follows:

| Year | Amount Assessed | Balance |
|------|------|------|
| 1980 | $ 4,501.00 | $ 2,665.51 |
| 1981 | 2,960.00 | 4,176.56 |
| 1982 | 10,414.00 | 22,023.37 |
| 1983 | 32,853.00 | 45,860.55 |
| 1984 | 63,400.00 | 102,181.20 |
| 1985 | 47,416.00 | 69,252.37 |
| | | $246,159.56 |

*See* N.T., at 312–24, 334–50, Exs. D–33, D–35. The base tax liability merely was taken by the Government from the 1040 and 1040X forms filed by Debtors. *See supra*

---

**3.** Justification for the presumption of correctness "lies in the government's strong need to accomplish swift collection of revenues and in the need to encourage taxpayer recordkeeping." *Portillo v. Commissioner of Internal Revenue*, 932 F.2d 1128, 1133 (5th Cir.1991).

**4.** If the taxpayer sustains its burden of establishing that an assessment is erroneous, the ultimate burden of proving the assessment is indeed correct rests on the government. *Resyn Corp. v. United States*, 851 F.2d 660, 663 (3d Cir.1988); *see generally Cebollero v. Commissioner of Internal Revenue*, 967 F.2d 986, 991 (4th Cir.1992).

pp. 650–51, FF ¶ 19–25. Additionally, Boch individually and the Bochs jointly executed consents to the assessment and collection of all increases and penalties. *See* N.T., at Ex. D–33. Debtors have offered no evidence to contradict the amounts of the assessments established by the Government and to which they previously consented.[5] Pursuant to the Internal Revenue Code, the Government also is entitled to interest. However, the Government did not provide computations for such interest past March, 1988; therefore, such interest and penalties are not set forth in liquidated amounts in the accompanying Order.

C. The value of the Government's secured claim.

■■■ Pursuant to Section 506(a), 11 U.S.C.,

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

Thus, where the lien exceeds the value of the collateral, the creditor has a secured claim to the extent of the value of the debtor's collateral, and an unsecured claim for the balance of the claim. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235–238, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989).

Section 506 does not fix the time at which the collateral is to be valued for purposes of determining the extent of the secured creditor's claim. The proper time for valuation varies depending upon the purpose of the valuation. *In re Woolley's Parkway Center, Inc.*, 147 B.R. 996, 1002 (Bankr.M.D.Fla.1992); *see also* H.Rep. No. 95–595, 95th Cong., 1st Sess. 356–57 (1977)

(stating that "[c]ourts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case"). In determining the extent to which a creditor is secured in a proceeding pursuant to Section 506(a) to determine the validity of a lien, the majority of courts have looked to the value of the collateral as of the date of the filing of the bankruptcy petition. *See In re Hubbard*, 135 B.R. 430, 432 (Bankr. S.D.Fla.1991); *United States v. Zlogar*, 126 B.R. 53, 57–58 (N.D.Ill.1991); *Frengel v. IRS (In re Frengel)*, 115 B.R. 569, 572 (Bankr.N.D. Ohio 1989) (stating that "[i]t is now well-settled that a secured creditor's interest in property is determined as of the date of the filing of the petition for relief"); *In re National Financial Alternatives, Inc.*, 96 B.R. 844, 848 (Bankr.N.D.Ill.1989); *In re Wells*, 52 B.R. 368, 369 (Bankr. E.D.Pa.1985) (stating that "[f]or purposes of lien avoidance under § 506 the size of the debt and the value of the property are determined as of the date of the filing of the petition"); *In re Brager*, 39 B.R. 441, 443 (Bankr.E.D.Pa.1984), *aff'd*, 49 B.R. 626 (E.D.Pa.1985). The rationale for a determination of valuation at the time of the filing of the petition is to permit "[p]ost-petition appreciations in the value of property, as well as after acquired property, [to] inure to the benefit of a debtor under the fresh start principle." *Frengel*, 115 B.R. at 572; *see also Zlogar*, 126 B.R. at 58.

In this case, the first item of property that must be valued is the Debtors' residence at 35 Skyline Drive, Mechanicsburg, Pennsylvania. Joseph Falcetta, a licensed real estate appraiser familiar with the Harrisburg area, submitted his appraisal valuing Debtors' residence at approximately $170,000.00. *See* N.T., at 17, Ex. P–1. However, the Bochs purchased the residence in 1986 for $185,000.00 and no home in the subdivision subsequently has ever sold for under $185,000.00. N.T., at 61, 111. Additionally, given the comparable sales identified by the Government, *see* N.T., at 106–07, 115–21, Exs. D–3–D–6, I conclude that Falcetta's appraisal is somewhat understated.

---

5. The liability for civil fraud penalties also is supported by the evidence offered by the Government in support of the nondischargeability of Boch's tax debt. *See infra* pp. 657–59.

The Government submitted the appraisal of Scott Primerick, valuing Debtors' residence at $244,000.00, using a cost approach to valuation, N.T., at 104, Ex. D–1, and at $235,000.00, using a market data approach. N.T., at 107, Ex. D–1. Primerick based his report, in part, on his belief that Debtors' residence was of custom construction. N.T., at 110. However, Debtors established that the residence actually was of modular construction. N.T., at 232–35, Ex. P–15. Additionally, Primerick admitted that he did not visit the residence or measure the square footage, and that if Falcetta's measurements of the square footage were correct, his appraisal should be reduced by $13,824.00. N.T., at 127. Given these facts, and Primerick's lack of experience in the Harrisburg market, N.T., at 91, I conclude that his appraisal is somewhat overstated.

Given the flaws in both appraisals, I will deem the value of Debtors' residence for purpose of determining the amount of the Government's secured claim to be $185,-000.00, approximately the mid-point between the appraisals, adjusted downward to account for hypothetical costs of sale. *Compare In re Jones*, 64 B.R. 380, 380 n. 2 (Bankr.E.D.Pa.1986) (valuing property at a mid-range figure based upon differing testimony as to value); *In re Coby*, 126 B.R. 593, 594–95 (D.Nev.1991) (adjusting value of property to account for hypothetical costs of sale); *see* N.T., at 17 (detailing hypothetical costs of sale).

With respect to the value of Debtors' joint personal property, the parties essentially are in agreement as to the following values: Cash of $1,312.00, *see* Complaint ¶ 5D, Furniture valued at $5,000.00, *see* Complaint ¶ 5D, a 1985 Honda Civic Wagon valued at $4,500.00, *see* N.T., at 44, a 1988 Ford Mustang valued at $10,000.00,[6] *see* N.T., at 45, a Dodge Caravan valued at $8,500.00, *see* N.T., at 46, a Yamaha motor-

cycle valued at $2,000.00, *see* Complaint ¶ 5I; N.T., at 66, Yard equipment valued at $1,000.00, *see* Complaint ¶ 5J; N.T., at 56–57, Office supplies valued at $750.00, *see* Complaint ¶ 5L, Office equipment valued at $500.00, *see* N.T., at 57, and hand tools valued at $200.00. *See* Complaint ¶ 5N. *See also* Defendant's brief at 14; Debtors' schedules and statements; N.T., at 43–52.

With respect to an interest in a limited partnership known as KOC Cherry, Boch purchased the interest in early 1989 for $10,500.00. N.T., at 52, 58. Boch offered only his own self-interested testimony to support his contention that the partnership interest has no value or is incapable of valuation. *See* N.T., at 53–54. Accordingly, I will accept the Government's position that the purchase price as a fair market value as of the time of the filing of the petition for relief. Finally, in his schedules and in his Complaint, Boch valued his accounts receivable at $20,000.00. *See* Complaint ¶ 5M. At trial, Boch attempted to introduce the report of a financial management service to support a determination of a lower value. *See* N.T., at 47–52. Boch, however, did not lay a proper foundation for the admission of such evidence. Accordingly, I will accept Boch's prior sworn statements of the value of the accounts in the schedules as an appropriate valuation.

All of the above assets are carried in the schedules and statements as joint property of Debtors. Debtors listed only jewelry and clothing as separate property, in the amount of $55.00 for Boch, and $350.00 for Linda Jo Boch.

■ The determination of the values of the real and personal property does not complete the inquiry of determining the value of the Government's secured interest. In connection with the Section 506(a) determination, "any prior liens ... must be deducted from the fair market value [of the collateral] in computing the amount of the putative secured creditor's allowed claim." *In re 222 Liberty Assoc.*, 105 B.R. 798, 801 (Bankr.E.D.Pa.1989); *Matter of Specialty*

---

**6.** Although Boch asserted that he gave the Ford Mustang to his son, *see* N.T., at 45, he admitted that legal title remains in his name. N.T., at 67.

Accordingly, I find the vehicle to be an asset of the estate.

*Cartage, Inc.*, 115 B.R. 164, 166 (Bankr. N.D.Ind.1989) (noting that federal tax lien "becomes valid against third parties who *subsequently* acquire an interest in the taxpayer's property" (emphasis added)). Federal tax liens are subject to liens prior in time to the extent the former lien was "choate," or fully established prior to the attachment of the federal tax lien. *See American Ntn'l Bank v. United States (In re Hawn)*, 149 B.R. 450, 454 (Bankr. S.D.Tex.1993); *Matter of Specialty Contracting & Supply, Inc.*, 140 B.R. 922, 924 (Bankr.N.D.Ga.1992); *United States IRS v. Akmakjian (In re Akmakjian)*, 91–2 USTC ¶ 50,367, 1990 WL 362055 (Bankr. C.D.Cal.1990) (stating that "the priority of federal tax liens vis-a-vis other liens is essentially based upon 'first in time is the first in right' ").

Here, at the time the petition for relief was filed, former or purchase money liens existed with respect to the following property and in the following amounts: Debtors' residence in the amount of $128,000.00, *see* Schedules and Statements at Schedule A–2, Summary of Debts and Property, the Dodge Caravan in the amount of $9,000.00, N.T., at 46, and the Ford Mustang in the amount of $8,500.00.[7] N.T., at 45.

Based upon the foregoing, I find the secured value of the Government's claim with respect to Debtors' residence to be $57,000.00, the secured value of the Government's claim with respect to Debtors' personal property, accounts receivable and investment limited partnership to be $46,-762.00, and the secured value of the Government's claim with respect to Boch individually to be an additional $55.00. The remainder of the Government's claims are unsecured.[8]

---

**7.** Boch testified that a lien existed on the Ford Mustang in the amount of $11,000.00 N.T., at 45. The schedules and statements reflect debt, albeit denominated as "unsecured," to Ford Motor Credit Corporation in the amount of approximately $8,500.00. From these proofs, I conclude that the debt was secured, and the amount was $8,500.00 at the time the petition for relief was filed.

**8.** Having made the Section 506(a) determinations, the next logical step would be to deter-

---

**D. The nondischargeability of the tax debt.**

The parties agree and have stipulated that Debtors' tax debt for the years 1980 through 1982 is nondischargeable pursuant to Section 523(a)(1), 11 U.S.C. *See* N.T., Court Ex. 1, Stipulation ¶ 5. The nondischargeability of the tax debt for the years 1983 through 1985 must be considered under Section 523(a)(1)(C).

Section 523(a)(1)(C), 11 U.S.C., excepts from discharge any federal income tax debt "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax...." The burden of proof as to nondischargeability under Section 523(a)(1)(C) is upon the Government by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–90, 111 S.Ct. 654, 659–61, 112 L.Ed.2d 755 (1991). *Cf. In re Graham*, 108 B.R. 498, 501 (Bankr.E.D.Pa.1989), *aff'd*, 131 B.R. 275 (E.D.Pa.1991), *vacated*, 973 F.2d 1089 (3d Cir.1992).

In construing Section 523(a)(1)(C), the courts have been guided by decisions addressing the imposition of civil fraud penalties under Section 6653(b), 26 U.S.C. *See Carlen v. Department of Treasury, Internal Revenue Serv.*, 1991 WL 424977, *slip op.* (Bankr.N.D.Ill.1991) (citations omitted); *In re Gilder*, 122 B.R. 593, 595 (Bankr.M.D.Fla.1990). As stated by the court in *Gilder*,

> The civil tax fraud penalty under 26 U.S.C. § 6653(b) requires a specific intent to evade a tax believed to be owing. Thus, proof of a debtor's conduct with the specific intent to evade a tax believed to be owing which would be sufficient to

---

mine whether the unsecured portion of the Government's liens may be avoided pursuant to Section 506(d). Courts differ over whether a federal tax lien may be so avoided. *Compare In re Dembo*, 126 B.R. 195, 201–02 (Bankr.E.D.Pa. 1991) *with In re McCullough*, 122 B.R. 251, 252–53 (Bankr.W.D.Pa.1990). I do not reach a determination as to this issue here, because Debtors have not requested such a determination their Complaint.

sustain a finding of civil tax fraud under 26 U.S.C. § 6653(b) is sufficient as proof of a willful attempt to evade a tax for purposes of § 523(a)(1)(C).

*Gilder,* 122 B.R. at 595 (citations omitted). Thus, in order to establish that tax debts are nondischargeable pursuant to Section 523(a)(1)(C), the Government must prove that the debtor's actions were deliberate and committed with fraudulent intent. *Carlen, slip op.* Because direct proof of intention often is not available, "proof of the taxpayer's intent may depend upon circumstantial evidence and reasonable inferences properly drawn from the evidence in the record." *Id.* at 17 (citing *Graham,* 108 B.R. at 498–99).

Where fraudulent intent is found, "the date of the taxable year in which the fraud occurred is immaterial." *In re Fernandez,* 112 B.R. 888, 891 (Bankr.N.D. Ohio 1990).

■■■ In this case, there is abundant circumstantial evidence from which willful evasion may be inferred on the part of Boch. First, after demonstrating knowledge of the requirement to pay taxes by filing returns for a number of years, *see* N.T., at 154, Ex. D–21, Boch did not file tax returns for five consecutive years. During those years, Boch had substantial taxable income. *See supra* pp. 649, 650, FF ¶¶ 6, 18; *see also* N.T., at 161, 163. Although failure to file is not dispositive of willful evasion, it is a factor that may be considered. Second, Boch consulted various proponents of tax evasion and procured false documentation for purposes of evading taxation. *See supra* pp. 649–50, FF ¶¶ 4–11. Boch entered into an agreement with himself in order to set up interest payments he did not actually make. *Id.* The agreement further was falsified by back-dating to cover periods for which Boch had not filed a tax return. As further evidence of fraudulent intent, Boch filled out receipts to provide false documentation for interest expense. *Id.*

Boch also titled a number of his vehicles in the name of Allfunds. *See supra* p. 650, FF ¶ 12. Although Boch claims to have done so in order to protect the vehicles from malpractice liability, it is reasonable to conclude that he also titled the vehicles in the Allfunds name in order to conceal the assets from the IRS. This conclusion is bolstered by the fact that Boch reported to Brownlee that he had retitled the vehicles. N.T., at Ex. D–16.

Other indicia of fraudulent intent include: Boch's membership in NCBE, his endorsement of approximately $20,000.00 in patient checks to NCBE, his behavior in cashing patient checks and making subsequent deposits of cash, and his decision to remove a number of documents from his office, including payment records, prior to a search by the IRS. *See supra* p. 650, FF ¶¶ 13–18. *Compare Gilder,* 122 B.R. at 596; *Fernandez,* 112 B.R. at 892; *In re Kirk,* 98 B.R. 51, 58 (Bankr.M.D.Fla.1989) (noting that "[a]ny conduct, the likely effect of which would be to mislead or conceal, has been held an indicia of fraud"); *In re Jones,* 116 B.R. 810, 814 (Bankr.D.Kan. 1990).

In *Klaphake v. Commissioner of Internal Revenue,* 60 T.C.M. (CCH) 195, T.C.M. (P–H) 90,375, 1990 WL 102242 (1990), the petitioner, a turkey farmer with an eighth grade education, attended a seminar concerning trusts, similar to the All funds trust arrangement in this case, that purportedly would minimize tax liability. The petitioner paid $10,000.00 for such a trust. Subsequently, the petitioner did not file income tax returns, but rather submitted tax forms to the trust vendors. In determining that the petitioner lacked fraudulent intent, the tax court explained that:

[petitioner] signed papers pertaining to the trusts without really knowing what they were. He never intended to avoid the payment of an income tax, but he believed that the trusts were a legal way to save taxes.

\* \* \* \* \* \*

[Petitioners] were unsophisticated and not well educated. They were good turkey farmers but had little knowledge of business, accounting, or taxation. They were good citizens of their community but were simple folk and easily led down the garden path. In every year from 1949 to 1978, petitioners faithfully re-

ported their income and filed joint Federal income tax returns. For 1978, 1979, and 1980, years after the trusts were created, petitioners did not report their income. However, petitioners believed the trust promoter's assurances that the trusts were a legal way to shift income. This belief may have been naive, but it was less than the intent necessary for fraud.

*Id.*

In this case, Boch is not an unsophisticated individual. He is a chiropractor with a number of years of higher education. At the time he first elected not to file an income tax return, Boch had available to him advice from an accountant who had prepared his tax return. *See supra* p. 649, FF ¶ 3. It was only *after* he had elected not to file a return and pay amounts owing to the IRS that Boch subsequently sought out advice from tax protestors and trust vendors.

Boch's defense to the substantial evidence of fraudulent intent is that, because he did not actually file fraudulent tax returns based upon the Allfunds trust or related documents, no fraudulent intent may be inferred. A fraudulent return, of course, would have provided more direct evidence of fraudulent intent. However, I find Boch's conduct in preparing artifices to avoid liability should he be forced to file returns to be adequate proof of willfulness in avoiding known tax obligations.

 Additionally, Boch's tax debt is nondischargeable pursuant to Section 523(a)(7), 11 U.S.C. In the Judgment and Probation/Commitment Order entered on the basis of Boch's plea agreement, Boch was ordered, as a special condition of probation, *inter alia,* to "pay all taxes, penalties and interest due." Courts have held that such special conditions constitute restitution orders, which are nondischargeable pursuant to the Supreme Court's decision in *Kelly v. Robinson,* 479 U.S. 36, 53, 107 S.Ct. 353, 362, 93 L.Ed.2d 216 (1986). *See In re Fernandez,* 112 B.R. 888, 892 (Bankr. N.D.Ohio 1990).

 Although I find Boch's tax debt to be nondischargeable, the Government failed to adduce evidence of willful evasion on the part of Linda Jo Boch. Although a determination of imputed willful evasion may be founded upon an agency relationship, *see, e.g., In re Paolino,* 89 B.R. 453, 460 (Bankr.E.D.Pa.1988), no evidence of such an agency relationship was offered by the Government. Accordingly, the tax debt will be deemed dischargeable with respect to Linda Jo Boch.

### Conclusions of law

1. I have jurisdiction over this matter pursuant to Section 1334(b), 28 U.S.C.

2. Pursuant to Section 157(b)(2)(A), (I), (K), and (O), 28 U.S.C., this is a core proceeding.

3. On or about March 17, 1988, the Government made valid assessments against Boch in the amount of $99,214.62, and against Debtors in the amount of $246,-159.56.

4. The values of the Government's secured claims for purposes of Section 506(a), 11 U.S.C., are as follows: $57,000.00, with respect to Debtors' residence; $46,762.00 with respect to Debtors' personal property, accounts receivable and investment limited partnership; and an additional $55.00 with respect to Boch's individual property. The remainder of the Government's claims are unsecured.

5. Debtors' federal tax liabilities, to the extent they are not entitled to secured status, are not entitled to priority pursuant to Section 507(a)(7). Court Ex. 1, Stipulation ¶ 9.

6. Debtors' federal income tax liabilities for the years 1980 through 1982 are nondischargeable pursuant to Section 523(a)(1), 11 U.S.C. Court Ex. 1, Stipulation ¶ 5.

7. Boch's federal income tax liabilities for the years 1983 through 1985 are nondischargeable pursuant to Section 523(a)(1)(C), 11 U.S.C.

8. Linda Jo Boch's federal income tax liabilities for the years 1983 through 1985 are dischargeable under Section 1141, 11 U.S.C.

AN APPROPRIATE ORDER WILL FOLLOW.